WORTH HENSON v. STATE.

192 So. 163
Opinion Filed November 3, 1939
Rehearing Denied December 5, 1939

*Zewadski & Pierce* and *G. K. Knowles,* for Plaintiff in Error;

*George Couper Gibbs,* Attorney General, and *Thomas J. Ellis,* Assistant Attorney General, for Defendant in Error.

THOMAS, J.—The plaintiff in error was prosecuted under an information alleging, in substance, that he designedly, by false pretense and with intent to defraud a bank and its vice president obtained from them $1,960.00, a better description of which was unknown, by securing a loan in that amount with certain bond interest coupons of the City of Bradenton which he pretended to own. It was further said in the formal charge that the bank and its officers believed the representations about the ownership and relied upon them with the result that in return for the note of plaintiff in error, with the coupons as collateral, they gave him a deposit receipt for the above sum which was put out "in due course of business." The information concluded with the averment that the statement of ownership was untrue and was known by him to be false when he made it.

Section 7258, C. G. L. 1927, denounces as a crime the obtaining from another any property "designedly by a false pretense * * * with intent to defraud."

The information is criticized by plaintiff in error because of its phraseology in describing the property alleged to have been fraudulently procured, that is, because it stated at one place that it was a certain amount of currency and in another that it was a deposit slip for said amount "which sum was by order of the said * * * paid out by said bank in due course of business."

By statute (8368 C. G. L. 1927) an indictment is sufficient which charges the offense substantially in the

language of the act which defines it, and no indictment or information should be quashed because of a defect unless the instrument is so vague as to "mislead the accused or embarrass him in * * * his defense." C. G. L. 1927, 8369.

Applying the rules which are calculated to safeguard the rights of the defendant but not to the extent of delaying or defeating the administration of justice, we are not convinced that the information contains the fatal defects which plaintiff in error would ascribe to it. The law describing the crime refers to any *"property"* obtained by false pretense. This property was shown to be a certain amount in currency, a more definite description of which was unknown. It is obvious that the bank's funds were sought in a loan to assure the repayment of which the tryee pledged securities which he said he owned.

At the conclusion of the information the transaction was further detailed by the allegations that the bank received the note evidencing the loan, accepted the securities, delivered a deposit "slip" for the amount of money, first described as "property," and paid the sum by order of defendant in due course of business.

The information follows very closely the one set out in Morris v. State, 54 Fla. 80, 45 South. Rep. 456, except for the manner of surrender of the property by the alleged victim of the fraud. There the manner of negotiating the loan was outlined and the money was "paid over" by the bank to the one who pledged property he did not own. Here, instead of delivering the amount of the loan, it is charged that the bank gave a receipt for it and paid the amount out "in due course of business." The information was sufficiently definite to apprise the defendant of the precise offense which the State would attempt to prove. There was no just cause for complaint either on the ground

that the information was too vague with reference to the time and place the accused received the money. The date was given, the phrase "then and there" used, and the clear meaning of the language was that the money was paid prior to the institution of the prosecution.

It is also urged that there was a failure to allege that there would have been no loss save for the false representations and to assert that the bank was actually injured. It is difficult to understand this position in view of the plain intent of the law and the unambiguous language of the information. It was not meant that the State should prove that there could have been no loss but for the defendant's misconduct, but only that because of it property was procured. It is not included in the law that some one must be injured, though this is a natural consequence as in this case where the lender, according to the charge, paid out several hundreds of dollars upon collateral deposited by one who was not the owner. See Morris v. State, *supra.*

The last two objections to the information urged before us are that the name of the true owner of the collateral was not given and "it appears that the title and ownership * * * could have been easily and readily ascertained * * *."

We dismiss these contentions with the observation that no duty devolves upon the State to allege, and therefore prove, the true ownership, the gist of the offense being the false representation that the defendant is the owner when in truth he is not. The allegation that the real status of the collateral could have been determined was not necessary. It was ruled in Smith v. State, 86 Fla. 525, 98 South. Rep. 586, that failure of the deceived party to examine public records was no defense to a charge of obtaining money under false representation that real estate was unencumbered. If not even a defense, certainly there could be no reason for the State to negative the availability of information which would establish the defendant's misconduct.

The information was sufficient. Having reached this conclusion, we will discuss briefly the evidence relied upon by the State to support the charge.

In 1935, the plaintiff in error, an auditor by profession, examined the books of the city of Bradenton covering the period from July 1 to October 8 of that year, and delivered the report to his client. Subsequently he supplemented this report with one for the same period detailing the securities then in the interest and sinking fund. In the years 1936 and 1937 he again served the city in this capacity. During the last audit the city council ordered bonds in the amount of $64,500, then in the sinking fund account, to be cancelled. The cancellation of the bonds was undertaken by the then city clerk, who testified in the case and his story was that in this task he was assisted by the plaintiff in error. When they had completed their work the perforated bonds were deposited in the city vault where they remained until another audit was made in the year 1938. The then auditor, Mr. William C. Worth, asked to check the bonds in the city vault and notified the city clerk that $14,500 of them could not be located.

After a diligent search, the city clerk got in touch with plaintiff in error and notified him of the loss. It was then discovered that the bonds had been deposited by plaintiff in error with a bank in Tampa as collateral, and the coupons from the said bonds had been hypothecated with a bank in Bradenton to secure a loan of $1,936. Witnesses then testified to various statements by plaintiff in error as to how he gained possession of the securities, one quoting him as saying that he bought them in Bradenton, another that he was buying them from a man in Sarasota, and another that he had procured them from his brother, who, the testimony developed, had died in the year 1936. Upon these

quotations we must rely for the defendant's explanation of the bonds being in his possession inasmuch as no testimony was offered on his part.

The testimony is very clear that plaintiff in error was thoroughly acquainted with the financial condition of the City of Bradenton and the number of bonds carried by it in its own interest and sinking fund. He had prepared at least two audits and when the bonds in the sum of $64,500 were cancelled at the direction of the city officials it was he who went with the city clerk to the bank and brought them to the clerk's office that they might be perforated. It was he who assisted the city clerk in the actual cancellation, a work of considerable proportions. He checked the bonds, listed them and included them within the report of his audit showing the total amount to be $64,500.

The original inventory prepared by him, while the cancellation progressed, was written in long hand and contained the numbers of the bonds of the total par value of $64,500 itemized consecutively. On the back of the list appeared these words: "Sinking Fund Bonds Cancelled 6-30-37 $64,500. O. K. W. Henson." It should be noted that this was more than a year after the death of his brother, although he was quoted by at least two witnesses as having said that he purchased the bonds from or through his brother. It was thought by those in authority that the cancelled bonds replaced in the city vault reached that amount and the error was not discovered for about a year. Meanwhile, plaintiff in error negotiated for loans from two banking institutions, depositing in the one the bonds and in the other the coupons.

It was a coincidence, damaging to his case, that bonds of the exact amount and description of those purloined from the city vault were found attached to notes of plaintiff in

error in a bank which had lent him money. It is incredible that he could have entered the bond market and bought in good faith the very bonds which he had attempted to assist the clerk in cancelling, and which he knew had been ordered cancelled by the city officials who employed him to make the audit. When the deficit was discovered he gave a rather vague account of the manner in which he came by the securities. As we have said above, he reported on one occasion that he was buying them from time to time, that he had secured some or all of them from a man whose name he did not divulge, and that he bought some or part of them from his brother, now deceased.

Under all of the circumstances reflected in this record, it seems that the jury was warranted in finding beyond a reasonable doubt that when the coupons were pledged with the bank named in the information, the pledgor, plaintiff in error, did not have title to them and that he knew as much about the infirmity of his title as any one else because of his familiarity with the city's affairs. The jury had a right to believe that he deposited the collateral with the intent to defraud the bank because he received from it a receipt for a deposit in the bank of $1,936. When he left the official who closed the loan, he was seen by this official to go to the desk used by patrons of the bank and there prepare some paper. Shortly afterward the same official went to the teller's window and saw a check for $1,500 written by plaintiff in error for which he was given that amount in cash. Later other monies, totaling more than the sum borrowed, were paid out of the account.

It is argued in the briefs, both in dealing with the motion to quash the information and the sufficiency of the evidence, that this does not meet the requirements of the law with reference to property actually obtained under false pre-

tenses. We are unable to draw so fine a distinction. We have the conviction that the plaintiff in error used securities which he did not own, that he was thoroughly acquainted with their status, viz.: that they had been ordered cancelled by the maker, city; that he had undertaken to assist the city clerk in the perforation of the bonds and coupons, that he took these coupons and induced the bank to lend him money thereon; that in that transaction and in subsequently drawing checks upon his account, enhanced to the amount of the loan, he obtained property from the bank and its official designedly by a false pretense and with the intent to defraud the bank and its officials as alleged in the information.

The presumption of innocence which clothed the defendant when he entered the trial was fully dispelled by this evidence.

About the argument that members of the family of the accused have suffered, we can say little. It is too often the case that when the wicked are punished the innocent suffer. With the term of imprisonment imposed we are not concerned. A board has been established by law to "temper justice with mercy" where penalties appear too harsh.

It is, therefore, ordered that the judgment be affirmed.

TERRELL, C. J., and WHITFIELD, BROWN and BUFORD, J. J., concur.

Justice CHAPMAN not participating as authorized by Section 4687, Compiled General Laws of 1927, and Rule 21-A of the Rules of this Court.